UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | No. 13 CR 167 |
| vs. | ) | |
| | ) | Honorable Virginia M. Kendall |
| JAMES VANI | ) | |

**Government's Consolidated Sentencing Memorandum, Objections to Presentence Investigation Report, and Response to Defendant Vani's Sentencing Memorandum**

The UNITED STATES of AMERICA, through its attorney, ZACHARY T. FARDON, respectfully submits the following position paper as to sentencing factors, objections to the Presentence Investigation Report, and response to defendant Vani's sentencing memorandum. Doc. 190. The government asks this Court to impose a within-Guidelines sentence.

**I.    BACKGROUND**

Defendant James Vani, a loan officer, participated in a mortgage fraud scheme involving condominium units located at 1351 North Ashland Avenue, Chicago, Illinois. Vani submitted false loan applications and false documents for five of the units in the North Ashland Building. The fraudulent documents submitted by Vani contained false representations about occupancy, income, and assets.

Vani was found guilty of two counts of wire fraud following a jury trial. The two counts of wire fraud related to the purchase of Unit 2B and Unit 3B

in the building, with false loan documentation sent to Homecomings Financial, LLC and Washington Mutual Bank FA, respectively.

The mortgage fraud scheme in which Vani participated began when Olanrewaju Okulaja arranged to buy the North Ashland building from Seller A.N. Seller A.N. had financed his acquisition of the North Ashland building through loans from Diamond Bank and Chicago Avenue Investments, Inc. Okulaja created a company with a name virtually identical to the entity in whose name Seller A.N. held title by simply adding a "1" to the end of the entity's name, to ensure that Okulaja received any excess mortgage loan proceeds after Seller A.N.'s indebtedness was paid off.

Okulaja, Vani, and Vani's co-defendant, Olabode Rotibi, worked as a team to gain access to mortgage loan proceeds for their own financial benefit. Okujala recruited buyers for the Ashland building. Rotibi, a licensed appraiser, created false appraisals for each of the units in the Ashland building, overvaluing the units and using fake pictures of condominium units that were much nicer than the North Ashland units. Vani secured the mortgage loans, in part by ensuring that different lenders were used for multiple the multiple units bought by the same person.

The closings on the seven units took place between January 31, 2008 and February 26, 2008. The smaller units sold for approximately $300,000 and the larger units sold for approximately $700,000. Okulaja's entity received the most profit from the sale of the larger units because the amount paid to Diamond Bank – approximately $300,000 – to pay off Seller A.N.'s loan stayed the same whether a small or large unit was sold. Thus, with the larger units, Okulaja's entity received approximately $300,000 in excess loan proceeds.

Vani participated in the sale of five of the units, with three purchased by Buyer V.S. and two purchased by Buyer J.G. Vani submitted false documentation to the lenders for all five units indicating the unit would be the buyer's "primary residence," even though Vani knew it would not be possible for the buyer to live in multiple units at the same time. Vani submitted loan applications where he represented that he had interviewed the buyers telephonically, when in reality he never spoke to either buyer. When lenders requested additional documentation, such as pay stubs, Vani faxed to the lenders falsified documents. A timeline showing a sampling of Vani's actions is attached as Exhibit A. As a result of Vani's

misrepresentations, the lenders approved all five loans. Ultimately, the buyers defaulted on all five loans, causing losses to each of the lenders.

On October 7, 2008, Vani was interviewed by the FBI and signed a written statement. In that statement, he acknowledged that Okulaja "gav[e] [him] the information for the loan applications directly, instead of the clients" and that Vani "realized at some point that the information on the loan applications was false." Tr. Ex. Vani 1. Specifically regarding the North Ashland building, Vani stated that he "knew that some of the information was false" on the loan documents but that he "submitted the loan applications anyway, because [he] knew [he] would make a lot of money and that was very hard to resist."[1] *Id.* At trial, Olabode Rotibi, who created false appraisals for the North Ashland units, testified that he delivered two envelopes to Vani from Okulaja, each containing $10,000 in cash.

---

[1] In his sentencing memoranda, Vani asserts, in mitigation, that after the North Ashland deals, he was approached by a government informant named Mhde Askar who asked Vani to process fraudulent loan applications, but Vani refused. Doc. 190 at 2. Vani was approached by Askar in July of 2008; Vani at first tells Askar that Vani will work with Askar to process some new loans, but ultimately Vani does not process the loans. At the time Vani met with Askar, Vani almost certainly knew Askar had been charged with mortgage fraud. Mhde Askar was arrested on January 17, 2008 and made a public court appearance on that same date – which was before any of the North Ashland units closed. *See United States v. Askar*, 08 CR 36, Doc. 5. Moreover, during his 2008 interview with the FBI, Vani admitted that he knew Askar had been arrested by the FBI when Askar approached him about the loans.

Additionally, Vani earned mortgage broker's fees, paid from the fraudulent mortgage proceeds, for each of the five units.

Vani's actions in the instant case were not the first or last time Vani committed mortgage fraud. As Vani admitted to the FBI, prior to the North Ashland deals, he submitted loan applications for buyers referred to him by Okulaja *and others*,[2] and that he "realized at some point that the information on the loan applications was false." Tr. Ex. Vani 1. Vani explained that a lender had notified him about the falsity of one of the loan applications, and that lender had "cut [Vani] off." *Id*. However, even after Vani received that notification from the lender, he agreed to work with Okulaja on the North Ashland deal, knowing those loan applications also contained false information. *Id*.

The North Ashland deals closed between January 31, 2008 and February 26, 2008. On February 27, 2008, Okulaja was arrested; as Rotibi testified at trial, both Rotibi and Vani were aware of Okulaja's arrest shortly after the arrest took place.

During this same time period, Vani was the loan officer for a $300,000 mortgage obtained by Buyer A.M. for the purchase of 3357 W. Ohio, Unit 3W

---

[2] The written statement explicitly references two other individuals, "Femi" and "Maroof."

– another building where Okulaja was part of a scheme to recruit straw buyers. Buyer A.M. was interviewed by law enforcement and confirmed that the items on her loan application were false, and that she never was interviewed by a loan officer despite her loan application's representation that she was interviewed by Vani. The unit closed on March 5, 2008. On February 29, 2008 – a few days after Okualaja's arrest – Washington Mutual sent Vani an email requesting a number of documents related to Buyer A.M. Instead of trying to stop the fraudulent deal, Vani allowed the deal to go through; for his efforts, his company was paid a broker's fee of $5,250 from the fraudulent mortgage proceeds. Ultimately, Buyer A.M. defaulted on the loan and the lender suffered a loss.

In 2013, while on bond for this case, defendant again committed a fraud by altering a price tag on a pair of headphones at an electronics store, purchasing them at a fraudulently low price.[3]   PSR ¶ 37.   Defendant's actions were in direct violation of his conditions of bond.

---

[3] The case arising out of Vani's 2013 arrest is set for trial on September 1, 2015.

## II. GUIDELINES CALCULATIONS

The government largely agrees with the Guidelines calculations[4] found in the Presentence Investigation Report[5], PSR ¶¶ 19-30, with one exception: the government also believes defendant should have a two-level enhancement for obstruction of justice based on defendant's perjury at trial under U.S.S.G. § 3C1.1. The Guidelines calculations are as follows:

| | |
|---|---|
| Base offense level under U.S.S.G. § 2B1.1(a)(1) | 7 |
| Enhancement under U.S.S.G. § 2B1.1(b)(1)(I) based on a loss amount between $1 million and $2.5 million | 16 |
| Enhancement for an offense involving sophisticated means under U.S.S.G. § 2B1.1(b)(10)(C) | 2 |
| Enhancement for abusing a position of trust and/or using a special skill under U.S.S.G. § 3B1.3 | 2 |
| Enhancement for obstructing justice under U.S.S.G. § 3C1.1 | 2 |
| TOTAL | 29 |

---

[4] Although the Guidelines are advisory, the Supreme Court has stressed that the district court must treat them as "the starting point and initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007). As such, the district court must properly calculate the guidelines range, treat the guidelines as advisory, consider the Section 3553(a) factors, and adequately explain the chosen sentence, including an explanation for any variance from the guidelines range. *Id.*

[5] The Guidelines calculations from the Presentence Investigation Report are from the Guidelines manual in effect as of November 2013; however, the Guidelines calculation is the same as it was at the time of the offense in the manual in effect as of November 2007, as well as the present manual in effect as of November 2014.

## A.    Base Offense Level and Loss Amount

Both the defendant and government agree that the base offense level is 7 under U.S.S.G. § 2B1.1(a)(1), and that there is a sixteen-level enhancement under U.S.S.G. § 2B1.1(b)(1)(I) based on a loss amount between $1 million and $2.5 million.  PSR ¶¶ 21-22, Doc. 190 at 7.

## B.    Sophisticated Means

Pursuant to Guideline § 2B1.1(b)(10)(C), defendant's offense level should be increased by two levels because the offense involved sophisticated means.[6]    Application Note 8 defines "sophisticated means" to mean "especially complex or especially intricate offense conduct pertaining to the

---

[6] In determining whether a sophisticated means enhancement is appropriate, the Court should examine the scheme as a whole:  Vani is responsible for "all reasonably foreseeable acts and omissions of others in furtherance of the jointly undertaken criminal activity," even if the case is not charged as a conspiracy.  *United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011) ("a sophisticated means enhancement could be applied to Braziel so long as the use of sophisticated means by other criminal associates was reasonably foreseeable to him." (citing *United States v. Crosgrove,* 637 F.3d 646, 666 (6th Cir. 2011); *United States v. Jenkins–Watts,* 574 F.3d 950, 965 (8th Cir. 2009))).

Vani notes that a proposed amendment to the Guidelines, which could take effect in November 2015, § 2B1.1(10)(C) will be amended to include the following italicized language: that the enhancement is applicable if "the offense otherwise involved sophisticated means and *the defendant intentionally engaged in or caused the conduct constituting sophisticated means*."  (Doc. 190 at 8)  There is no proposed language making this amendment retroactively applicable.   Even if this amendment were applicable, defendant Vani intentionally engaged in the sophisticated conduct – he admitted to the FBI he knew about the fictitious entity created by Okulaja to give the appearance of clear title, and he submitted numerous false loan applications and supporting documentation to the lenders.

execution or concealment of an offense." Included within this category is "[c]onduct such as hiding assets or transactions … through the use of fictitious entities." Guideline § 2B1.1, Application Note 8(B). Also included is conduct that "shows a greater level of planning or concealment than a typical fraud of its kind"—for example, where the fraud spans a lengthy period of time and involves numerous complex fraudulent transactions. *United States v. Green*, 648 F.3d 569, 576 (7th Cir. 2011).

In this case, the false information provided to lenders included false statements about occupancy, false income amounts, false representations regarding assets, and appraisals created by Rotibi that falsely inflated the value of the properties. For each loan, Vani falsely represented that he interviewed the buyer telephonically to obtain the information on the loan application. When Vani filled out the loan applications, he marked each unit as a "primary residence," even though he knew that the buyers were buying two or three units at the same time. Some of the lenders were also sent false "letters" from the buyers, including a letter faxed to WAMU from Vani that stated that Buyer J.G. intended to move from his home in Aurora to the North Ashland Building to be closer to work and because the North Ashland building was "newer and nicer" than the buyer's home in Aurora. Tr. Ex. 3B

6. The buyer testified at trial that he did not write or sign this letter, nor did he intend to move to the North Ashland building.

Additionally, Vani staggered the lenders as to a buyer purchasing multiple units so that no one lender would discover the buyer had already obtained or was about to obtain another mortgage loan for another unit in the same building. The multiple steps taken by Vani to defraud the lenders makes this scheme sophisticated. *See, e.g., United States v. Anobah*, 734 F.3d 733, 738 (7th Cir. 2013) (affirming a sophisticated means enhancement for a loan officer involved in a scheme that "false documents created in support of the loan applications" as well as "straw purchasers, false property assessments" as well as the false verification of information in a multi-state mortgage fraud scheme).

Additionally, in order to conceal the fact that the seller did not have clear title due to the outstanding construction loan from Diamond Bank on the property, the seller, Okulaja, created a sham entity named very similar to the name of the original owner of the property in order to appear to lenders that Okulaja had clear title. In his sentencing memorandum, defendant claims that he was "oblivious" to sophisticated parts of the scheme including "setting up a front corporation." Doc. 190 at 8. However, this contention is in

10

contradiction to Vani's confession to the FBI, where he explained that he was aware of this deception, stating that Okulaja told him "that they used a '1' on the end of their corporate name to make it look like they never transferred title from the previous owner." Tr. Ex. Vani 1. As Application Note 9(B) to § 2B1.1 states, "[c]onduct such as hiding assets or transactions, or both, through the use of fictitious entities [or] corporate shells . . . ordinarily indicates sophisticated means."

### C.    Abuse of Trust/Special Skill

Under U.S.S.G. § 3B1.1, a two-level enhancement is applicable when a defendant abuses a position of trust and/or uses a special skill in a manner that "significantly facilitated the commission or concealment of the offense." As described above, the Vani's knowledge of the mortgage industry, and his ability to refer loan applications to lenders significantly facilitated the commission of the offense because without mortgage loan approval, the scheme would not be successful.

During the scheme to defraud, Vani was employed by First National Mortgage as a mortgage broker/loan officer. PSR ¶ 64. Vani also held a Mortgage Loan Originator License from the State of Illinois from 2004 -2005

and 2007-2014[7] and from the State of Indiana from 2011 through 2014. PSR ¶ 60. As part of his application, Vani signed an affidavit on December 27, 2006 stating, among other things, that he would "not knowingly make, propose, or solicit fraudulent, false, or misleading statements on any mortgage document," that he would not "engage in conduct that constituted dishonest dealings," and that he would "give reasonable consideration to a borrower's ability to repay the debt." A copy of Vani's affidavit is attached as Exhibit B.

The Seventh Circuit has held that an individual who works as a loan officer not for a specific lender, but instead at an independent company, owes their fiduciary relationship to the borrower, not to the lenders.[8] *See United States v. Fuchs*, 635 F.3d 929, 933-34 (7th Cir. 2011). In the *Fuchs* case, the Seventh Circuit held that the defendant, a mortgage broker, did not violate his fiduciary duty to the borrowers because the borrowers "either had actual knowledge of the fraud" or "at least should have known of the fraud." *Id*. at 934. Unlike in *Fuchs*, the buyer who testified at trial, J.G., did not have

---

[7] The PSR lists Vani's licensing date in the State of Illinois as 2007-2014; however, the records obtained from the Illinois Department of Financial and Professional Regulation show that Vani first obtained a loan originator license on June 30, 2004 which was valid until 2005; Vani reapplied in 2007 and was granted a license until 2014. Tr. Ex. IDFPR 1.

[8] In this case, the lender representatives also testified that they relied on brokers, including Vani, to put accurate information on the loan applications.

knowledge of the fraud nor could he have been aware of the fraud due to a language barrier. As J.G. testified at trial, he does not speak English, and believed that when he was signing real estate documents, he was only doing so as a co-signer to help a friend purchase a home. J.G. trusted Vani and the others involved in the transaction, but Vani did not uphold his fiduciary relationship.

Alternatively, the enhancement can be supported because Vani had a "special skill." The *Fuchs* case did not examine whether or not a mortgage broker possesses a "special skill," focusing solely on the abuse of trust. Unlike the unlicensed defendant in *Fuchs*, Vani held a loan originator license from the State of Illinois; in order to obtain the license, he had to complete hours of training, as well as complete annual continuing education.[9] Vani had years of experience with loan origination from his employment at Countrywide. PSR ¶ 65. Vani's licensing and knowledge is a "special skill" within the meaning of § 3B1.1. *See, e.g., United States v. Grant,* 479 Fed.Appx. 904, 906 (11th Cir. 2012) (holding that a loan officer possessed a "special skill" when he "gained a detailed knowledge of loan-application and loan-processing procedures during the three years he worked as a loan officer

---

[9] *See* http://www.idfpr.com/Banks/RESFIN/LoanOriginators.asp.

or mortgage broker before committing mortgage fraud"); *United States v. Longwell*, 410 Fed.Appx. 684, 692 (4th Cir. 2011) ("the skill possessed by a mortgage broker qualifies as a special skill" as "they certainly possess a skill not possessed by members of the general public which is obtained through training and licensing"). Accordingly, the enhancement can also be affirmed because Vani used a "special skill" to facilitate this fraudulent scheme.

### D.    Obstruction of Justice

Vani falsely testified at trial, claiming he thought that Buyer J.G. represented to lenders he intended to occupy both units that he purchased because Buyer J.G. intended to turn the units into a duplex. Such a contention is contradictory to Vani's written statement from 2008, where he wrote that "I submitted the applications for [Buyer J.G.] even though both were for primary residence loans. . . I knew that some of the information was false." Tr. Ex. Vani 1.

Vani also falsely claimed that he did not learn the loan applications were false until after Okulaja got arrested. Again, such a claim is directly contradictory to the written statement signed by Vani in 2008. In that statement, Vani admitted that he submitted loan applications given to him by Okulaja because he had a "good business relationship" with him, but that

he "realized at some point that the information on the loan applications was false." Tr. Ex. Vani 1. Vani then stated he believed he learned about the falsities after a bank requested a tax return for an applicant from the IRS and then told Vani "the application was bad," presumably because the income information on the loan application did not match the return. *Id*.

The statement further represents that "I thought that because I didn't get in any trouble after that, it might not be so bad. I was making a lot of money, so I kept doing business with them." *Id*. Vani further explained that, at some point, he stopped doing business with Okulaja because Okulaja wanted Vani to share Vani's commission with Okulaja, but that later Okluaja "came back to [him] later with a bunch of deals at 1351 N. Ashland." *Id*. It is clear from the timeline outlined by Vani that Vani learned Okulaja was giving Vani loan applications with false information well before Vani ever processed the loans from 1351 North Ashland. Additionally, Vani knew at the time that each of the loans purported to be for the borrower's "primary residence," even though Vani knew the buyers were buying multiple units at the same time and could not possibly live in all of the units. The jury did not credit Vani's testimony, instead finding that he acted knowingly.

Because Vani chose to testify at trial and to lie to the jury, an enhancement for obstruction of justice under U.S.S.G. § 3C1.1 is warranted. Application Note 4(B) to § 3C1.1 explains that obstructive conduct includes "committing, suborning, or attempting to suborn perjury." When applying the obstruction enhancement based on perjury, "the district court should make a finding as to all the factual predicates necessary for a finding of perjury: false testimony, materiality, and willful intent." *United States v. Chychula*, 757 F.3d 615, 619 (7th Cir. 2014). Vani testified falsely about his state of mind at the time of the fraud, and his state of mind was certainly material as the government had to prove Vani's knowledge as an element of the crime.

Vani concedes that he was "objectively mistaken about matters in the case," but argues that his lies about his knowledge at the time of the scheme were made because the Vani had a "high level of stress"[10] during his trial and that he was testifying about events that occurred "in October of 2007 and 2008." Doc. 190 at 12. Vani continues to minimize his actions, again claiming that "not focusing on the accuracy of the information in loan

---

[10] During Vani's interview with Dr. Eric Ostrov, a setting where defendant certainly would have been under less stress than when he testified at trial, Vani continued to falsely maintain that at the time he submitted the loan documents, he "didn't realize bad stuff was going on." Ostrov Rept. at 9.

application was very common" in 2008. *Id*. None of Vani's explanations for his testimony demonstrate that his decision to lie on the stand was anything less than willful and calculated. Vani's claim that he did not know the loan applications contained false information went to the heart of his case; it is not an area where defendant could be easily mistaken or could have forgotten with the passage of time. Vani's only purported failure of memory was directed to those facts and events that would have implicated him in the fraud. Because Vani's false statements under oath were willful, the obstruction enhancement is applicable.

## IV.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(a)

The framework for determining an appropriate sentence is set forth in 18 U.S.C. § 3553(a), which requires that the Court ensure the sentence imposed properly considers, among other factors: (1) the nature and circumstance of the offense; (2) the history and characteristics of the defendant; (3) the need to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (4) the need to afford adequate deterrence; and (5) the need to avoid unwarranted sentencing disparities.

Considering these factors, along with the advisory Sentencing Guidelines, the government recommends a within-Guidelines sentence. Each of these factors is discussed in greater detail below:

### A. NATURE AND CIRCUMSTANCE OF THE OFFENSE

The North Ashland scheme involved the sale of high-priced condominium units through the use of false representations to obtain the mortgage loans needed to fund the purchase. Vani played a crucial role in this mortgage fraud scheme; he used his knowledge of the mortgage loan industry, including knowledge he gained during his employment at Countrywide, to cause lenders to loan money to individuals who otherwise would not have qualified for the loans. PSR ¶ 65. Vani profited both from a broker's fee and from the cash payments from Okulaja, delivered to Vani by Rotibi. Vani admitted in the written statement that the North Ashland loan files were given by Okulaja to Vani to process because a previous mortgage broker was unable to get the deals "done." Tr. Ex. Vani 1. Vani used his knowledge of the industry to help find lenders for five of the North Ashland units. Vani made a variety of false representations about the buyer's income, assets, and intent to occupy the residence to each of the lenders. Ultimately,

the buyers defaulted, and each of those lenders suffered losses ranging from $177,000 for Unit 2B to $513,000 for unit 3C.

Vani attempts to minimize the seriousness of the offense by blaming the victim lenders, whom he categorizes as "fully complicit" in the fraud, asserting that they "took eager borrowers' qualifications on faith, often with a willful disregard for a borrower's ability to pay." Doc. 190 at 15-16. Vani's assertions are unsupported by the record; as was exhibited at trial, the lenders did attempt to verify some of the items on the loan applications, including income and assets. In response to the lender's attempts to verify the loan application, Vani sent the lenders additional fictitious documents – fabricated pay stubs that look legitimate, bank statements that had been altered. As just one example, as CitiMortgage was reviewing the loan application for buyer V.S., Vani faxed[11] the lender a fictitious paystub on January 14, 2008; the next day, Vani faxed an additional fictitious paystub and two bank statements believed to be fabricated. Tr. Exs. 1C 2,3. When lenders did attempt to verify the items on the loan applications, it was Vani who thwarted their efforts. An individual lender also had no way of knowing a key piece of information that Vani possessed – the same buyer was

[11] Each of these documents has a fax cover sheet that states "From: Jim Vani," with a FAX header stating "Jim Vani."

obtaining multiple units in a time frame compressed as to not appear until after the closings on the buyer's credit report. In other word, each lender had no way to determine that the buyer was also obtaining another mortgage that same month. The lenders, not Vani, lost thousands of dollars on each of these mortgages when the buyers defaulted.

### B. HISTORY AND CHARACTERISTICS OF THE DEFENDANT

Vani grew up with a loving family, has a high school and some college education, and obtained both a Mortgage Loan Originator License and a Real Estate Broker License. PSR ¶¶ 40-43, 55-60. In support of his sentencing memorandum, Vani submitted a psychological evaluation report written by Dr. Eric Ostrov, submitted under seal. According to the report, Vani has an "above average" IQ as well as "abstract reasoning" that is "well above average." Ostrov Rept. At 11. Vani had all the tools to be able to support himself by legal means: helping borrowers qualify for loans using accurate information, or helping buyers and sellers conduct real estate transactions. Instead, Vani turned to fraud. In his own words, he explained that he did it solely because "I knew I would make a lot of money and that was very hard to resist." Tr. Ex. Vani 1.

In Vani's written statement, he admits that, prior to the North Ashland deals, a lender reached out to him to tell him that there was false information on a loan application. *Id*. Instead of using that information as a wake-up call to stop dealing with Okulaja and others that Vani knew were committing fraud, Vani kept processing the fraudulent loan applications because he "didn't get in any trouble" and he was "making a lot of money." *Id*. From that point forward, Vani's eyes were certainly wide open to the fraud in the loan applications – but he participated in the fraud anyway.

As noted above, when Vani became a licensed loan originator, he took an oath that he would not knowingly make any "fraudulent, false, or misleading statement" on any mortgage document "including a mortgage application." Ex. B. He also took an oath that he would "give reasonable consideration to a borrower's ability to pay." *Id*. Vani broke that oath when he provided lenders with fraudulent information to obtain loans for individuals who could not afford to make two or three mortgage payments every month – harming both the lenders and the buyers in the process.

In Dr. Ostrov's report, he opined that there is a "high probability" that Vani has a "substance abuse problem" based largely on his alcohol use, though Vani did tell Dr. Ostrov that he was not drinking in 2008, which is

the time period of the commission of the instant offense. Ostrov Rept. At 4, 12. In order to promote Vani's rehabilitation, it is appropriate for the Court to recommend that Vani receive substance abuse treatment while incarcerated, and to make substance abuse treatment a condition of supervised release.

Additionally, Dr. Ostrov opined that Vani "can act in impulsive ways that can and have gotten him into trouble," which lead to both the instant case and his 2013 arrest. Ostrov Rept. at 13. There is no indication in Dr. Ostrov's report, however, that Vani does not appreciate the difference between right and wrong.[12] Additionally, mortgage fraud is not "impulsive" in the same way that split-second decision to rob a bank would be considered "impulsive." Vani faxed or mailed a number of fraudulent documents to several different lenders over the period of several weeks, and he dealt with multiple buyers at the same time. *See* Ex. A. His attempts to ensure the lenders approved the loans took deliberation, planning, strategy, and coordination with other co-schemers.

Dr. Ostrov opined that Vani's behavior reflects "impulsivity and lack of judgment rather than any attempt to harm or exploit others." *Id*. However,

---

[12] If Vani is truly unable to control his impulsive behaviors and avoid fraudulent behavior, a term of incarceration is the only way to protect the public.

Vani's behavior did harm others: it harmed the lenders, and it harmed Buyer J.G., who was not aware he was purchasing condominium units in his own name, and whose credit was negatively impacted when he could not afford the mortgage payments. Vani's actions were taken to benefit himself at the expense of others, as he received a portion of the loan proceeds as an envelope cash from Okulaja, delivered by Rotibi.

## C. THE NEED TO AVOID UNWARRANTED SENTENCING DISPARITIES

The advisory Guidelines range itself provides an objective range that promotes the goal of minimizing unwarranted sentencing disparities. *See, e.g., United States v. Mykytiuk*, 415 F.3d 606,608 (7th Cir. 2005) ("[t]he Guidelines remain an essential tool in creating a fair and uniform sentencing regime across the country"); *United States v. Boscarino*, 437 F.3d 634, 638 (7th Cir. 2006) ("[s]entencing disparities are at their ebb when the Guidelines are followed, for the ranges themselves were designed to treat similar offenders similarly"). Treating similar offenders similarly "was the main goal of the Sentencing Reform Act" and "[t]he more out-of-range sentences that judges impose. . . the more disparity there will be." *Boscarino*, 437 F.3d at 638. Therefore, the Court should give serious consideration to the advisory

Sentencing Guidelines, which call for a term of imprisonment of 87 to 108 months' imprisonment.

Vani argues that because "the titans of Wall street who made billions in profits" from mortgages are not incarcerated[13], he should not be either. Doc. 190 at 20. However, Vani's argument is misplaced. First, as noted above, the lenders in this case did attempt to verify the assets and income of the borrowers, and were thwarted by Vani's actions. There is no indication the lenders acted with fraudulent intent, and yet the lenders bore the loss from Vani's actions. The group of individuals who is most comparable to Vani are other loan officers and mortgage brokers – and there are many examples of loan officers and mortgage brokers who have been sentenced to significant terms of incarceration after they submitted fictitious documents to lenders. *See, e.g., United States v. Jackson*, --- F.3d ---, 2015 WL 3478670 at *1 (7th Cir. June 3, 2015) (loan officer sentenced to 36 months' incarceration); *United States v. Natalizio*, --- Fed. Appx. ---, 2015 WL 2179760 at *1 (7th Cir. May 11, 2015) (mortgage broker sentenced to 38 months' incarceration);

---

[13] The need to avoid unwarranted sentencing disparities applies only "among defendants with similar records *who have been found guilty of similar criminal conduct*." 18 U.S.C. § 3553(a)(6) (emphasis added). Section 3553(a) does not contemplate treating those who are not prosecuted similarly to those who have been convicted of a felony. *See, e.g., United States v. Brewer*, 332 Fed.Appx. 296, 306-07 (6th Cir. 2009) (explaining that the treatment individuals who receive immunity is outside the "reach" of 3553(a)(6) as they were not "adjudged guilty").

*United States v. Haywood*, 777 F.3d 430, 431 (7th Cir. 2015) (loan officer sentenced to 151 months' incarceration).

The probation officer recommends a below-guidelines sentence, reasoning that Vani should receive a lower sentence than Okulaja, who received a sentence of 35 months' imprisonment. Doc. 135. However, this reasoning ignores the fact that Okulaja's sentence was driven in large part by his acceptance of responsibility and a 50% reduction in his sentence from the low end of his Guideline range based on his early cooperation. Okulaja was arrested in February 2008 and immediately began to cooperate with the government. Okulaja pleaded guilty to one count of wire fraud in *United States v. Okulaja et al*, 08 CR 179 (N.D. Ill). Pursuant to the plea agreement, Okulaja agreed to cooperate and, in exchange, the government agreed to recommend a sentence that was 50% of the low end of the Guidelines range of 70-87 months' incarceration. *See* 08 CR 179, Doc. 142. Okulaja testified truthfully in the trial of his co-defendants, Viktor and Lilya Domnenko. Okulaja was sentenced to 35 months' incarceration. *See* 08 CR 179, Doc. 184. Vani should not be treated the same as Okulaja at sentencing because Okulaja accepted responsibility and testified truthfully during his co-

defendants' trial, unlike Vani who has not accepted responsibility and committed perjury.

Vani should not be treated the same as Okulaja as it diminishes the warranted reasons for a sentencing disparity – namely Okulaja's acceptance or responsibility and cooperation. *See United States v. Bartlett*, 567 F.3d 901, 907 (7th Cir. 2009) (explaining that the incentive to cooperate with the government "takes the form of a lower sentence for a cooperator than for an otherwise-identical defendant who does not cooperate," a distinction that "cannot be illegitimate" under § 3553(a)(6)). After all, Section 3553(a)(6) "allows for *warranted* disparities among co-defendants' sentences." *United States v. Borrasi*, 639 F.3d 774, 785 (7th Cir. 2011) (emphasis in original).

Similarly, Olabode Rotibi is Vani's co-defendant in this case; he pleaded guilty pursuant to a cooperation agreement where the government agreed to recommend a sentence of 66% of the low end of his Guideline range of 51-63 months' incarceration. Doc. 92, 147. Rotibi was ultimately sentenced to 24 months' incarceration. Doc. 151. Rotibi is an individual who accepted responsibility, agreed to cooperate, and testified truthfully during defendant Vani's trial. Vani's sentence should be greater than Rotibi's sentence to

account for the differences between the two – namely to account for Rotibi's cooperation and acceptance.

### D.   THE NEED TO AFFORD ADEQUATE DETERRENCE

The goals of sentencing include both specific and general deterrence. In this case, both goals call for a within-Guidelines sentence.

#### i.   *Specific deterrence*

Vani poses an economic risk to the community.  Over the course of several months, Vani made multiple misrepresentations to multiple lenders to obtain mortgage loans.  In 2013, while on bond for this case, Vani again committed a fraud by altering a price tag on a pair of headphones at an electronics store.  PSR ¶ 37.   Vani's actions were in direct violation of his conditions of bond, and raise concerns about his ability to abide by conditions of supervised release.

#### ii.   *General Deterrence*

The need for general deterrence is most compelling when the conduct is lucrative and difficult-to-detect, as was the fraud in this case.  *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes

go to increase the expected benefits of a crime and hence the punishment required to deter it." Vani's scheme was extremely lucrative, and the number of falsehoods provided to lenders were difficult for the lenders to detect until it was too late and the buyers began to default.

## V.    SUPERVISED RELEASE

The government has no objections to the conditions of supervised release proposed by the Probation Office. Doc. 135. In *United States v. Thompson*, 777 F.3d 368 (7th Cir. 2015), the Seventh Circuit held that sentencing courts must make an independent determination that each condition of supervised release imposed on a defendant is rationally and reasonably related to the offense conduct and characteristics, and to the sentencing purposes identified by 18 U.S.C. §§ 3583(c) and 3553(a)(1), (a)(2)(C), and (a)(2)(D). 2015 WL 151609 at *6-7. Additionally, the Court must state the reasons for imposing each condition, and ensure each condition is not broader than necessary to achieve the purposes of sentencing. *Id*.

In light of the Court's ruling in *Thompson*, the government concurs with the Probation Office and asks the Court to impose the following conditions of supervised release:

### Mandatory Conditions

The following conditions are mandatory under 18 U.S.C. § 3583(d):

1.   Defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon.

2.   Defendant shall submit to the collection of a DNA sample as directed by the probation officer.

3.   Defendant shall not commit another federal, state, or local crime.

4.   Defendant shall not unlawfully possess a controlled substance. Defendant shall refrain from any unlawful use of a controlled substance. Defendant shall submit to one drug test within 15 days of release from imprisonment and random drug tests thereafter at the direction of the U.S. Probation Office.[14]

### Discretionary Conditions of Supervision

Under 18 U.S.C. § 3583(d), the Court has discretion to impose conditions of supervised release that are "reasonably related" to the factors set forth in 18 U.S.C. § 3553(a), that "involve[ ] no greater deprivation of liberty than is reasonably necessary," to meet the goals of § 3553(a), and that are "consistent with any pertinent policy statements issued by the Sentencing Commission."

---

[14]     The Court retains discretion not to order drug testing if defendant "indicates a low risk of future substance abuse." *See* 18 U.S.C. §§ 3583(d), 3563(a)(5). The government respectfully submits that defendant is not a low risk of future substance abuse because of the past substance use outlined in the PSR. PSR ¶¶ 50-54.

The following conditions are consistent with the factors set forth in § 3553(a) and should be imposed on the basis that they facilitate supervision by the probation officer, which is important here to promote defendant's respect for the law and deter the defendant from future crimes[15]:

5.     Defendant shall report to the probation office as directed by the probation officer.  *See* U.S.S.G. § 5B1.3(c)(2).

6.     Defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer.  *See* U.S.S.G. § 5B1.3(c)(3).

7.     Defendant shall not leave the judicial district without the permission of the Court or probation officer.  *See* U.S.S.G. § 5B1.3(c)(1).

8.     Defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer.  *See* U.S.S.G. § 5B1.3(c)(11).

9.     Defendant shall permit the probation officer to visit the defendant at home or work at any time, and to confiscate any contraband in plain view of the officer.[16]  *See* U.S.S.G. § 5B1.3(c)(10).

10.    Defendant shall notify the probation officer at least ten days prior to any change of residence, employment, or workplace.  *See* U.S.S.G. § 5B1.3(c)(6).

---

[15]    Proposed conditions numbered 5-10 are not explicitly listed in the Probation Officer's recommendation, though the officer does recommend "the standard conditions that have been adopted by this Court." Doc. 135.

[16]    An additional reason for this condition is that the defendant's knowledge that he is subject to the probation officer's scrutiny at any time will encourage compliance with the law.

The following conditions of release support defendant's rehabilitation and reintegration into the community.[17]  *See* 18 U.S.C. § 3553(a)(2)(C) and (D).  Because defendant has a history of alcohol abuse and has indicated he may need mental health treatment, conditions that allow for alcohol and mental health treatment are appropriate.  *See* PSR ¶¶ 49, 50-53. Additionally, conditions of release mandating that defendant work or perform community service also provide rehabilitation for defendant and ensure that he is engaged in lawful pursuits rather than criminal activity.

11.   Defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons.  *See* U.S.S.G. § 5B1.3(c)(5).

12.   If defendant is unemployed after the first 60 days of supervision, or if unemployed for 60 days after termination or layoff from employment, he shall perform at least 20 hours of community service work per week at the direction of an in the discretion of the U.S. Probation Office until gainfully employed.  *See* U.S.S.G. § 5B1.3(e)(3).

13.   Defendant shall not associate with any persons engaged in criminal activity.  *See* U.S.S.G. § 5B1.3(d)(9).

---

[17]   Again, proposed conditions eleven, thirteen, and sixteen were not explicitly recommended by the Probation Office, though they may fall into the "standard conditions that have been adopted by this Court."  The government believes these conditions are appropriate to facilitate Vani's rehabilitation.

14. Defendant shall participate in an approved mental health program as directed by the probation officer. *See* U.S.S.G. § 5B1.3(d)(5).

15. Defendant shall participate in alcohol treatment, including counseling and urinalysis testing, as directed by the probation officer. *See* U.S.S.G. § 5B1.3(d)(4).

16. Defendant shall refrain from excessive use of alcohol (meaning 5 or more drinks during a single period of approximately 2 hours) and shall not purchase, possess, use, distribute, or administer any controlled substance, or any paraphernalia related to any controlled substance, except as prescribed by a physician. *See* U.S.S.G. § 5B1.3(c)(7).

Finally, conditions related to defendant's restitution obligation are appropriate in light of the significant losses his scheme caused to the victim lenders:

17. Defendant shall make restitution to the victim of the offense.

18. Defendant shall not incur new credit charges or open additional lines of credit without the approval of a probation officer unless the defendant is in compliance with the financial obligations imposed by this judgment. *See* U.S.S.G. § 5B1.3(d)(2).

19. Defendant shall provide a probation officer with access to any requested financial information necessary to monitor compliance with conditions of supervised release. *See* U.S.S.G. § 5B1.3(d)(3).

## VI.   RESTITUTION AND FINE

Restitution is mandatory under 18 U.S.C. § 3663A(a)(1).  The actual loss to the lenders is $1,637,683.[18]

Although the advisory Guidelines range is a fine ranging from $12,500 to $125,000, the government does not recommend a fine in this case due to the large amount of restitution.  PSR ¶¶ 70, 79.

## VII.  CONCLUSION

For the foregoing reasons, the United States respectfully requests this Court impose a within-Guidelines sentence.

ZACHARY T. FARDON
United States Attorney

By:     s/ *Michelle Petersen*_____
DIANE MACARTHUR
MICHELLE PETERSEN
Assistant United States Attorney
219 S. Dearborn
Chicago, IL 60604
(312) 353-5300

Dated: June 26, 2015

---

[18] Although some of the defrauded lenders no longer exist, including Homecomings Financial, that does not preclude the Court from ordering restitution be paid to any successor entity.